## STATE EX REL. HENDERSON v. BURDICK, STATE AUDITOR.

APPROPRIATIONS—STATE EXAMINER—SALARY OF—CONSTITUTIONAL LAW.

1. The provision in the act creating the office of state examiner that such officer shall receive an annual salary of two thousand dollars, which shall be paid in the same manner as other salaries of state officers are paid, operates as an appropriation of money to be paid out of the state treasury, and a special appropriation at each biennial or regular session of the legislature is not required to keep it alive.

2. In view of the custom to pay the salaries of state officers, monthly, where there is no particular time prescribed by statute, and there being no constitutional or statutory provision fixing the time for paying certain state officers, including the examiner, the auditor and treasurer may very properly make a rule that the salaries of such officers be paid monthly.

3. The constitutional requirement that no money shall be paid from the treasury except upon appropriations made by the legislature or by law, means that no money shall be paid out of the treasury except in pursuance of some law.

[Decided June 1, 1893.]

This was an action in mandamus brought on the relation of Harry B. Henderson against Charles W. Burdick as State auditor, to require the issuance of a warrant in payment of the salary of relator as State examiner for the month of April, 1893. It was an amicable proceeding to determine whether or not there had been an appropriation by law of the amount of said salary sufficient to authorize the auditor to issue a warrant therefor when earned. The auditor had endorsed upon the claim as presented the following: "The salary of the State examiner is a legal and just claim against the State of Wyoming, but as no appropriation was made by the second State legislature for the salary of State examiner I decline to draw a warrant on the State treasury payable to said officer for the amount of his salary for April, 1893, as represented by this voucher." The case was heard upon demurrer to the petition, the allegations of which are fully set forth in the opinion.

*Lacey & Van Devanter*, for relator.

Citing the following: (Constitution, Art. III, Secs. 32 & 35; Art. XIV, Sec. 7; Art. XIV, Sec. 1; Art. IV, Sec. 14; Laws 1890-91, Sec. 27, p. 362; Donnellan v. Nichols, 1 Wyo., 61; opinion of Attorney General Ind. 1888, p. 155; Report of Attorney General Colo. 1889-90, p. 60; id. 1891-92, p. 23; State ex rel. Rotwitt v. Hickman, treasurer, 9 Mont., 370; State ex rel. Wade v. Kenney, Auditor, 10 Mont., 485; State ex rel. Buck v. Hickman, Treasurer, 10 Mont., 497; State ex rel. Maddox v. Kenney, Auditor, 10 Mont., 533.

*Charles N. Potter*, Attorney General, for respondent.

GROESBECK, CHIEF JUSTICE.

This proceeding invokes the original jurisdiction of this court, and is submitted on the petition of the relator for the writ and the demurrer thereto. The following facts appear from the petition: The relator is the duly and regularly appointed and qualified State Examiner of the State of Wyoming, and was such during the entire month of April, 1893. On

the 18th day of May, 1893, he presented to the auditor of the State his bill and voucher duly verified, against the State for the sum of $166.66, the amount of his salary as State Examiner for the month of April last past, and demanded a warrant upon the State Treasurer in payment of the same. The auditor disallowed said claim, endorsing thereon as cause for disallowance that there was no appropriation by the Second State Legislature with which to pay said salary for the said month of April, 1893. Under section 27 of the act providing for the office of State Examiner, defining his powers and duties, prescribing his bond and fixing his compensation, approved January 10, 1891 (Ch. 84, Sess. Laws 1890-91), it is provided that the State Examiner shall receive an annual salary of two thousand dollars, which sum shall be paid by the treasurer in the same manner as other salaries and expenses of other State officers are paid. The salaries of other State officers, except such as are specifically required by law to be paid quarterly, are allowed by the auditor and paid by the treasurer of the State monthly. It is alleged in the petition that in and by said section 27 of the act referred to, the sum of $2,000.00 per annum is appropriated by the Legislature and by law for the purpose of paying the salary of the State examiner, and so an amount of money sufficient to pay said salary, due to the relator for said month of April, 1893, is in the treasury and has been regularly appropriated by the Legislature of the State, and by law, as required by the constitution of the State.

The constitutional provision for this office is in the following words:

"The Legislature shall provide for a State examiner who "shall be appointed by the Governor and confirmed by the "Senate. His duty shall be to examine the accounts of (the) "State treasurer, supreme court clerks, district court clerks, "and all county treasurers, and treasurers of such other public "institutions as the law may require and (he) shall perform "such other duties as the Legislature may prescribe. He "shall report at least once a year, and oftener if required, to "such officers as are designated by the Legislature. His com-

"pensation shall be fixed by law." Const. Wyo., Art. IV, Sec. 14.

The act referred to creating the office (Ch. 84, Sess. Laws 1890-91) fixes the compensation in the following language:

"Sec. 27. The State examiner shall receive an annual "salary of two thousand dollars, and a contingent fund of not "to exceed fourteen hundred dollars for the incidental ex- "penses of his office, which same shall be paid by the treas- "urer of the State, in the same manner as other salaries and "expenses of State officers are paid."

The first State Legislature made an appropriation "for State examiner from January tenth, eighteen hundred and ninety-one, four thousand dollars," Sec. 2, Ch. 61, Sess. Laws 1890-91, the act being approved on the same day as the act fixing the compensation and duties of the State examiner. This appropriation was in the general appropriation bill for the expenses of the State government and covered the period from the passage of the act until and including March 31, 1893. No appropriation was made in the appropriation act or by any statute passed by the second Legislature for the salary or contingent expenses of the State examiner for the fiscal years and biennial term beginning March 31, 1893, and ending March 31, 1895, although appropriations were made to pay the salaries of all State officers except the veterinarian, the examiner and the board of live stock commissioners. The claim of the relator is based wholly upon the provisions of section 27 of the act creating the office of examiner, quoted supra. The following are the provisions of the constitution relating to the payment of moneys from the treasury of the State:

"Except for interest on (the) public debt, money shall be "paid out of the treasury only on appropriations made by the "Legislature, and in no case otherwise than upon warrant "drawn by the proper officer in pursuance of law." Art. 3, Sec. 35.

"No money shall be paid out of the State treasury, except "on appropriations by law, and on warrant drawn by the "proper officer, and no bills, claims, accounts or demands

"against the State, or any county or political subdivision,
"shall be audited, allowed or paid until a full itemized state-
"ment in writing, verified by affidavit, shall be filed with the
"officer or officers whose duty it may be to audit the same."
Art. 16, Sec. 7.

It will be seen that the first section quoted (Sec. 35, Art.
3) employs the words "appropriations made by the Legisla-
ture," while the latter (Sec. 7, Art. 16) uses the term "ap-
propriation by law." These terms "Legislature" and "law"
seem to be used as synonyms. They appear to be employed
interchangeably, and are evidently so used in the section di-
recting the creation of the office of State examiner (Sec. 14,
Art. IV, supra), where the direction is that the "Legislature"
shall provide for the office, specifying in the list of his duties
that he shall perform such other duties as the "Legislature"
may prescribe, and provides that he shall examine such other
public institutions as the "law" may require. His compensa-
tion shall be fixed by "law." The executive of the State is
entrusted with a veto power by the constitution, which may
be over-ridden by a vote of two-thirds of the members elected
to each house, and which may become an absolute veto if the
bill be not approved, in case it is presented to him within the
last three days of the session, and he retains it without re-
turning it, when he has fifteen days after the adjournment to
approve or disapprove it. It certainly cannot be successfully
contended that the Legislature alone can enact any law, with-
out the assent of the governor, or by passing it with a two-
thirds vote of the membership of each house, except where his
veto becomes absolute by the failure to pass and present the
bill to him in sufficient time for him to return it with his
objection to the house where it originated. In other words,
any appropriation to be effective must be a "law." Possibly,
the meaning of these constitutional provisions construed to-
gether is that an appropriation must be made by statute, and
not by the force of any constitutional provision. It is not
necessary, however, to consider this question, as the appro-
priation in this case, if any there be, is made by a statute and
not by reason of any provision of the constitution. Does

section 27 of chapter 84 of the Session Laws of 1890-91, which provides for the compensation of the State examiner make a valid appropriation for his salary? There is no provision in our constitution, as there is in the constitution of some states, requiring legislative appropriations annually or biennially to make funds in the treasury available for the payment of the ordinary expenses of the government. The limitation in the Federal Constitution is that "no money shall be drawn from the treasury but in consequence of appropriations made by law." The object of this limitation and that contained in the constitutions of the several states of similar import is to secure to the legislative department the exclusive power of deciding how, when and for what purposes the public funds shall be applied in carrying on the government. 2 Op. Attorney General, 670. It had its origin in the British Parliament, when the people of Great Britain, to provide against abuse by the king and his officers of the discretionary power with which they were vested, demanded that the public funds should not be drawn from the treasury except in accordance with express appropriations therefor made by Parliament. Hallm's Const. Hist., 55. This was the fruit of the English Revolution of 1688, which sent the king to Versailles and changed the succession to the throne. This wise restraint has become a part of the fundamental law of nearly every State in the Union. It has been well said that these provisions were "obviously inserted to prevent the expenditure of the people's treasure without their consent, either as expressed by themselves in the organic law, or by their representatives in constitutional acts of legislation. To use the language of Justice Story (3 Vol. Com. on Con., Sec. 1342), its purpose 'is to secure regularity, punctuality and fidelity in the disbursements of the public money.' And as said by Judge Tucker in his commentaries * * * * 'All the expenses of the government being paid by the people, it is the right of the people, not only not to be taxed without their own consent, or that of their representatives freely chosen, but also to be actually consulted upon the disposal of the money.' 'Such a provision,' says the same learned writer, 'forms a salutary check, not only

upon the extravagance and profusion in which the executive department might indulge itself, and its adherents and dependents, but also against any misappropriation which a rapacious, ambitious or otherwise unfaithful executive might be disposed to make. In those governments where the people are taxed by the executive, no such check can be interposed. The prince levies whatever sum he thinks proper; and would deem it sedition against him and his government if any account were required of him, in what manner he had disposed of any part of them. Such is the difference between governments where there is responsibility and where there is none.' " Thomas v. Owens, 4 Md., 225. This opinion, which has been much cited, then proceeds to show that the constitutional provision in that State that the comptroller "shall receive" an annual salary of $2,500.00, was the expression of the will of the people in their written constitution and must be obeyed, as the fiat of their supreme will. The constitution of Maryland inhibited the Legislature from diminishing the salary of State officers and on this point the court say:

"Were it not for such a provision, the whole government "would exist only by permission of the Legislature....It can "only be carried on through the instrumentality of individ- "uals, and their services can only be obtained by being paid "for. The framers of the constitution and the people who "adopted it, aware of this, determined not to submit the "durability of their work to the caprice, passion or prejudice, "which possibly might, at times of great excitement, triumph- "antly rule the action of the Legislature; and, therefore, "wisely did the work themselves by engrafting in the organic "law a provision for the protection of those who should be "charged with its execution; in other words, they made the "appropriation."

In our State constitution, salaries provided for certain State officers, the governor, secretary of State, auditor, treasurer, are temporarily fixed, "until otherwise provided by law," with the rule, repeated in almost every instance where salaries are mentioned, that such salaries shall not be increased or diminished during the period for which such officers were

elected or appointed, and in addition to this, there is the general rule prescribed that no law shall increase or diminish the salary of any public officer after his election or appointment. Art. 3, Sec. 32. This was intended to secure official independence and to prevent the Legislature from being assailed by the demands of importunate officials to the detriment of public business. The stability and permanence of the salaries of public officials were guaranteed by the constitution after once fixed, secure during the official term from legislative control. Commissioners v. Burns, 3 Wyo., 704-718. Although some courts seem to distinguish between salaries fixed by the constitution and those fixed by an unrepealed statute, it seems that this is a distinction more nice than wise. In either case, the people have given their assent to the measure, in one method by their organic law, which they have accepted, adopted and ratified by their votes, and in the other by their representatives in the Legislature. The salaries are to be fixed by law, and all such officers, whether of the State, county, city, town or school "shall be paid fixed and definite salaries." Art. 14, Sec. 1, Const. Wyo. The law relating to the State examiner provides that he "shall receive" an annual salary of two thousand dollars, and the constitution requires that his compensation shall be fixed by law, and shall be a fixed and definite salary which shall not be increased or diminished after his election or appointment. It will be conceded that the second Legislature could not have reduced his salary during his term, either by a direct act for that purpose, or in an appropriation bill. It is equally clear that they could not take it away directly or indirectly. An imperative direction to create the office is found in the constitution, and the same authority is bestowed in that instrument to fix the compensation. The first State Legislature in obedience to that mandate did create the office and fix the compensation of the officer. This law has not been repealed. If the constitution had fixed the salary and the time and manner of payment, there would have been no doubt under the great weight of authority, that this would have been an appropriation made by "law" as the supreme law had so provided and

an act of the Legislature, it seems, would have been unnecessary.    State ex rel. Rotwitt v. Hickman, 9 Mont., 370, 23 Pac., 740; citing in support of this proposition Thomas v. Owens, 4 Md., 189; Green v. Purcell, 12 Md., 333; State v. Weston, 4 Nebr., 216.    In this case, State v. Hickman, the Montana Supreme Court say upon this point:

"We do not know of any rule to the contrary where the "same constitutional provisions exist which are embodied in "the supreme law of the State.    An illustration of the princi- "ples which are applied where salaries of the officers are not "prescribed by the constitution, and the case of Thomas v. "Owens, supra, is not followed, may be found in Myers v. "English, 9 Cal., 348."

And again:

"We cannot add anything to the discussion of this vital "proposition.    The doctrines which were announced in "Thomas v. Owens, supra, have been accepted for years with- "out a question, and have remained inflexible under every "test."

In the California case, Myers v. English, 9 Cal., 348, the court declined to follow the ruling in Thomas v. Owens, but Field, J., did not concur with the other two judges in the opinion, although he did not expressly dissent.    The court in the Montana case seems to think there was a difference in applying a direct constitutional provision providing for salaries of State officers and one made by a statute in force, but the California court held differently, and say:

"But we think it must be conceded that the decision is a "case in point, and sustains, fully, the position taken, not- "withstanding this difference.    The principle involved is the "same."

And further:

"But with all due deference to the learned and distin- "guished jurists who decided the case of Thomas v. Owens, "we are compelled to arrive at a different conclusion."

The opinions of the California Supreme Court have not been consistent on this subject, as appears in the note to the case of Carr v. State, taken from 127 Ind., 204, found in 22

Am. State Reports, 638. In the case of McCauley v. Brooks, 16 Cal., 11, at page 28, the court announce this doctrine:

"When the Constitution, therefore, says that 'no money "shall be drawn from the treasury but in consequence of ap- "propriations made by law,' it only means that no money "shall be drawn except in pursuance of law."

This decision was evidently not in harmony with Redding v. Bell, 4 Cal., 333, and Myers v. English, 9 Cal., 348, and it was apparently overruled in Stratton v. Green, 45 Cal., 149, where the rule announced in Redding v. Bell was "preferred." But the later cases in that State are in harmony with the case of McCauley v. Brooks; Proll v. Dunn, 80 Cal., 220, 22 Pac., 143, and Humbert v. Dunn, 84 Cal., 57, 24 Pac., 111; see State v. Kenney (Mont.) 26 Pac., 197. In the case of Humbert v. Dunn, the relator was a member of an examining commission on rivers and harbors, and asked for a writ of mandate commanding the controller of the State to draw a warrant in favor of relator for $200 for salary as a member of said commission for the month of November, 1889, the same having been presented to the State board of examiners and by them audited, allowed and approved and ordered paid out of any money in the State treasury not otherwise appropriated, the controller having refused to draw his warrant therefor. The court say that the usual formula "there is hereby appropriated the sum of........dollars out of any moneys in the State treasury not otherwise appropriated for the payment of salaries," etc., is not found in the act, but the intention of the Legislature was clearly manifested in the language used which was that "each member............. shall receive a salary of two thousand four hundred dollars per annum, payable monthly," and that it was to be paid out of any money in the State treasury not otherwise appropriated; and it held that there was nothing in such language indicating any intention to postpone the payment of the salaries of the commission until the next session of the Legislature. In this case, as in the case of McCauley v. Brooks, it was held that it is not essential to the validity of an appropriation that the usual formula "there is hereby appropriated

the sum," etc., or any of them should be used, if the Legislature fixed the amount of the claim and designated its payment out of a certain fund. In Campbell v. Board of Commissioners, 115 Ind., 594, an act of the State Legislature appropriating $200,000 for the erection of a soldiers' and sailors' monument, and providing a compensation for the commissioners and their secretary, was under consideration. It was held that the sum appropriated must be applied to the structural work of the monument, excluding incidental expenses and the compensation of the officers; and that these expenses and compensation could be paid under another statute authorizing the auditor of State to draw warrants on the treasury for all moneys directed by law to be paid out of the treasury to public officers, or for any other object whatever, as the same became payable. The court say:

"It is true, as claimed, that no money can be rightfully "drawn from the treasury, except in pursuance of an ap- "propriation made by law; but such an appropriation may be "made impliedly, as well as expressly, and in general as well "as specific terms. It may also be a continuing or fixed ap- "propriation, as well as one for a temporary purpose, or a "limited period. The use of technical words in a statute "making an appropriation is not necessary. There may be "an appropriation of public moneys to a given purpose with- "out in any manner designating the act as an appropriation. "It may be said, generally, that a direction to the proper "officer or officers to pay money out of the treasury on a given "claim or class of claims, or for a given object, may by im- "plication be held to be an appropriation of a sufficient "amount of money to make the required payments. Ristine v. "State, 20 Ind., 328." This case was affirmed in Henderson v. Board of Commissioners (Ind.), 28 N. E., 127.

In State v. Weston, 6 Neb., 16, it was held that as the provisions of the constitution of Nebraska were that no money could be drawn from the treasury except in pursuance of a "specific" appropriation made by law, there was no such specific appropriation made by a statute which provided for the compensation of an officer, or the incidental expenses of

his office, and when they were to be paid, as the manner of payment and out of what particular fund they were to be paid was not mentioned, the statute being silent in that respect. A ruling to the same effect may be found in State ex rel. Blackford v. Kenney (Montana), 26 Pacific, 388, and the syllabus to the case indicates that the constitutional limitation in Montana is about the same as that of Nebraska. The word "specific" is omitted in the provision in our constitution but if it were not, the reasoning in the case of State v. Bordelon, 6 La. Ann., 68, seems to me to be clearer. It is said in the judgment of the district court, a view which was adopted by the supreme court:

"Is the appropriation specific in the intent of the constitu-"tion? It is specific in the amount to be paid—two thousand "five hundred dollars a year. It is specific in the person to "whom it is to be paid—one or the other of the named offi-"cers, as the case may be. It is specific as to the time when "the money is to be paid in each year during two years. It "is specific as to the purpose for which it shall be used—the "maintenance of the legion (of the Louisiana militia) and cer-"tain other volunteer companies. It is specific as to the money "out of which the same shall be paid—any moneys in the "treasury not otherwise appropriated. In what other respects "an appropriation could be constitutionally required to be "specific, has not been suggested by counsel, nor does it occur "to the court. In the only sense, then, in which the words of "the constitution can have any meaning, so as to distinguish "a specific appropriation from any other appropriation, the "present act seems to be as specific as it can possibly be made."

It was said in Reynolds v. Taylor, 43 Alabama, 430, where the law fixing the compensation of marshal of the supreme court declared "the annual salary of the marshal is two thousand dollars," and a general section of the code provided in effect that the salaries of all officers are payable monthly, notwithstanding the fact that the Legislature had made an appropriation in another and later act for such officer at the rate of one thousand dollars per annum, it was held under the authority of a case decided thirty years previous (Nichols

v. The Comptroller, 4 Stewart & Porter, 154) that in order to
authorize the comptroller to issue his warrant on the treas-
ury for the amount of the salary, it was not necessary that
there should be a special annual appropriation by act of the
legislature, where there was a general law fixing the amount
of the salary, and prescribing its payment at particular peri-
ods, and the court observe: "We are not aware that this de-
cision has been doubted from that day to the present time."
It has been no unusual thing for a legislature to adjourn with-
out making appropriations for the salaries of State officials or
some of them, either through intention or mistake. In Col-
orado it was held by the Attorney General that a law fixing
the salary of the Adjutant General at $1,800 per year, payable
monthly, the same as a general provision as to other State
officers, constituted an appropriation within the meaning of
the constitution of that State, which closely resembles in this
particular our fundamental law. This opinion says that: "the
case of People v. Spruance, 8 Colorado, 530, might appear,
from a casual reading, to be opposed to the proposition above,
but a careful reading of this decision shows that it does not
apply to any case of fixed salaries, such salaries being guar-
anteed by the constitution." Rep. Att'y Gen., Colo., for
1890-91, —, 60, followed by the next Attorney General of that
State (Rep. for 1891-92, p. 23). The Indiana legislature failed
to make any appropriation for the fiscal year ending October
31, 1888. The Attorney General of that State held that a
general act providing that the officers named there-
in should be entitled to receive and charge for
their services as such officers, the salaries, fees and
compensation allowed and set out in the act, and this and
other statutes either "expressly appropriated the sums named,
or provided that the officer shall receive the sum named as
his salary, thereby creating an appropriation by force of the
language used," according to the rules laid down in the
opinion deduced from the decisions of the courts. Report
and Opinions Att'y Gen. Indiana, 1888, p. 155. These views
of the law departments of these States seem to have been

accepted without question and without a struggle in the courts.

But we have a ruling in this jurisdiction made at an early day, which is directly in point. The legislature had failed to make a direct appropriation for the transportation of criminals. The supreme court of the territory held that a general law providing that the county commissioners, when it became necessary to transport, or to transport and provide for, any idiot, lunatic, insane, blind, deaf, deaf-mute or criminal to any eastern asylum, school or prison, should apply to the Governor for pecuniary or other aid in such case; and if the Governor approved the application, he was authorized to call upon the auditor for a warrant upon the treasurer, in favor of the board of county commissioners, sufficient for the purpose, and it should be placed in the hands of the county commissioners, who should be officially and personally responsible for the proper application of such funds, as far as they might be able, was a sufficient authority to compel the auditor to audit the proper account for the same and to compel the treasurer either to pay the account when audited or to certify that there were no funds in the treasury to pay the same. Donnellan v. Nichols, 1 Wyo., 61. It was in effect held that the general statute met such emergencies as the one presented, the failure of the legislature to appropriate moneys for such purposes in an appropriation bill.

In the general appropriation act of the Second Legislature making appropriations until March 31, 1895, which fails to provide for the salary and expenses of the veterinarian and the examiner (Ch. 22, Sess. Laws 1893), Section 48 provides that any and all balances remaining in the treasury on the 31st day of March, 1895, more than the outstanding obligations then contracted for and properly payable from such appropriations, shall be converted into the general fund on that day, but excepted from the provisions of the section all balances in any special fund established by law, which are continued in their respective fund and made available for their proper use. Section 49 of this act repeals all inconsistent acts and parts of acts, and provides that "no money shall be paid out of the

State treasury during the period covered by this act, and for the purposes herein provided, in excess of the appropriations hereby made, or otherwise specially provided by law," etc. It seems then that the legislature intended that other appropriations theretofore made were to be paid and other funds theretofore created were to remain intact and subject to future disposition according to law, untrammeled by this general appropriation act. In addition to the constitutional provision the territorial statutes continued in force after the admission of the State, provide that no warrant shall be drawn by the auditor, or paid by the treasurer, unless the money has been previously appropriated by law, and further, that in all cases where the law recognizes a claim for moneys against the Territory (State) and no appropriation shall be made by law to pay the same, the auditor shall audit and adjust the same, and give the claimant a certificate of the amount therefor, under his official seal, if demanded, and shall report the same to the legislature, with as little delay as possible. Rev. Stat. Wyo., Secs. 1709, 1711. Another provision is that in all cases of accounts audited and allowed against the territory (State) and in all cases of grants, salaries, pay and expenses, allowed by law, the auditor shall draw a warrant on the treasurer for the amount due, in the form set forth by the revenue department. Id. Sec. 1708. The provision is for the issuing of the certificate of indebtedness by the auditor, where the law recognizes a claim against the State, but there is no appropriation to pay for it or some portion of it. It seems that salaries "allowed by law" were not to be governed by this provision, but by that of another section, supra, where in such case the auditor shall draw his warrant upon the treasurer for the amount due. Under a statute in Alabama, requiring the controller or auditor to examine and adjust the claims of all persons against the State, where provision for payment had been made by law, it was held that such a provision "manifestly refers to special claims against the State, and does not refer to the salaries of public officers where not only the amount but the time of payment is determined by the general law." Reynolds v. Taylor, 43 Ala., 430.

The annual salary of the examiner must be paid by the treasurer of the State in the same manner as other salaries of State officers are paid. This indicates that the salary is to be paid out of the same fund as that from which other State officers are to be paid. It has never been the legislative custom in this jurisdiction to make biennial appropriations at each regular legislative session for all purposes or to meet all the obligations of the State, contracted or incurred by statute. The acts for the maintenance of the university and the insane asylum, each require the levy of a specific tax annually for such purpose, and this has been deemed a continuing appropriation. After the taking effect of these acts providing for such specific levies, no subsequent legislature has deemed it necessary to provide for the support of these institutions by direct appropriations therefor or by renewing the tax, and the same may be said of the tax levied annually pursuant to law for the incidental expenses connected with the management of the capitol building. Interest on the public debt is paid without a direct appropriation therefor. The first State legislature provided for the compensation of presidential electors in a special act regulating their duties and time and place of meeting. No specific appropriation was made otherwise than by this act, and none was necessary, as the appropriation in the act itself was sufficient, and is a perpetual one, so long as the law is in force. It is clear that the act creating the office of State examiner does in Section 27 thereof make an appropriation at least for the salary of such officer, which is a continuing appropriation. The appropriation is exact as to the amount of money, the person to whom it is to be paid, when it is to be paid, that is, for each year, and that the treasurer shall pay it. The direction to the treasurer to pay the amount of the annual salary of the examiner to that officer may be held by implication to be an appropriation of a sufficient amount of money to make the required payments. Campbell v. Board of Commissioners, 115 Ind., 594; 18 N. E., 33, supra. The fund set apart and allotted to this purpose is the general fund of the State provided from the general revenue. The expense of maintaining the

State government is paramount to all others and must be set apart before other claims are paid. In re Appropriations, 13 Colo., 316; 22 Pac., 464. It is true that no time of payment of the salary of the examiner is provided in the act, but I do not think this is material.

It has been the custom to pay State officers in this State monthly where there is no particular time prescribed by statute when they shall be paid, or at what intervals payments may be made on account of their salaries. This was conceded on argument and is so alleged in the petition, which must be taken as true on demurrer. It can make no difference to the State that this method is pursued, and it may be left to the auditing department to fix such a rule of monthly payments, when there is no provision of the law to the contrary. There being no statutory or constitutional provision fixing the time of payment of certain State officers, including the examiner, the auditor and treasurer may very properly make a rule that the salaries of such officers may be paid monthly.

As has been indicated herein, the constitutional requirement that no money shall be paid from the treasury except by appropriations made by the legislature or by law, means that no money shall be paid out of the treasury except in pursuance of some law. It inhibited the expenditure of public moneys at the mere caprice of those in power at their own pleasure, without authority derived from the sovereign people, as expressed by them, either in their written constitution, or by the consent of their representatives freely chosen, in their solemn enactment. The appropriation here made is by law and by the legislature, and that expressed will of the people through their chosen representatives stands unrepealed and unmodified.

A law fixing the salary of a public officer cannot under the constitution be so modified or repealed as to increase or diminish his salary or emoluments after his election or appointment. In the United States it is conceded to be a fundamental axiom of government that the three great departments of government shall be kept separate, distinct and independent of each other. As is well said by Chancellor Kent at page 281 of Vol.

1 of his Commentaries: "It would be in vain to declare that the different departments of government should be kept separate and distinct, while the legislature possessed a discretionary control over the salaries of executive and judicial officers. This would be to disregard the voice of experience and the operation of invariable principles of human conduct. A control over a man's living is, in most cases, a control over his actions." This power to deprive a public officer of his salary for a stated term ought not to be lodged in a single branch of the legislature, to such an extent that during a period of great political excitement, or through party rancor, or dislike of an official, by failure or refusal to make an appropriation for his salary he might be singled out and shorn of the remuneration for his labors for a term or a portion of his term, in flagrant disregard of the constitutional provision securing him a definite and fixed salary to be ascertained before he accepted the office. If a case arises where an officer has been derelict in his duties or guilty of malfeasance in office, the methods prescribed by the organic or statutory law to secure his displacement or punishment should be pursued. If his salary cannot be diminished during any portion of his official term, it certainly cannot be withheld for a certain portion of his term by a failure to provide at each session of the legislature a sufficient sum to pay his salary already fixed and appropriated by law. To hold otherwise is to say that the legislature, or one branch of it, at one session, may by non-action, suspend the operation of a public statute, providing that an officer "shall receive" a certain, definite and fixed salary to be paid by the treasurer of the State, and thus deprive the State of his services and in effect abolish the office, when it is created and the compensation of the officer fixed under a constitutional mandate. To grant this, is to make all officials mendicants upon the bounty of the legislature, whenever that body meets, and to reduce the other departments of state to a condition of vassalage to one department, a state of affairs abhorrent to the constitution and in palpable violation of many of its express provisions.

The act before us is in effect and operation an appropria-

tion act, and it stands unrepealed and unmodified. It provides for the compensation of a public officer and requires the treasurer to pay it. It does not require any other legislation, or a special appropriation at each biennial and regular session of the legislature to keep it alive and effective.

This proceeding was stated to be an amicable one, in order to determine the question, which the auditor did not wish to assume the responsibility of deciding. He was cited to show cause on this application why the writ should not run. The cause being submitted on demurrer to the petition, it must be overruled and the peremptory writ must be allowed.

CONAWAY and CLARK, JJ., concur.